docket 23-1008. Counsel, we are ready to hear your argument. Please begin when you're ready. Thank you, your honors. May it please the court, Jake Rocheveau for the appellant Megan Hess. In calculating actual loss to the victims, the district court committed two related errors. First, the court thought all money paid by the medical research companies as a result of the fraud constituted actual loss, even though they suffered no economic harm. Second, the court categorically refused to apply any credits against loss for goods and services the next of kin victims actually received. Because these two errors together affected the guideline range, and the second error alone affected the restitution order, this court should remand for resentencing. As for the medical research companies, the mere fact that they spent money as a result of the fraud does not mean that they lost money as a result of the fraud. Indeed, as the PSR made clear, the companies derived an economic benefit from the transaction, and therefore, they weren't entitled to any restitution because they suffered no actual loss. Now, the government tries to draw a distinction between the restitution calculation saying that that has no bearing, that the company's actual loss for purposes of restitution has no bearing on the guideline loss calculation. But that's true only in two contexts which don't exist here. First, that's where the victim is reimbursed after the fraud was discovered. In that case, they've already been compensated and can't be compensated again under a restitution order, but it still counts as actual loss under the guidelines. And second, there may be a difference where the guidelines calculation of loss isn't based on actual loss. It's where it could be based on intended loss or gain. But here, where the guidelines loss calculation was based on actual loss, the restitution and the guidelines loss calculation should have been the same. Ms. Hess was also entitled to offsets for goods and services provided to the next of kin victims. The guidelines provide that the To be sure, there are some exceptions under the guidelines, but none of them apply here. Weren't they bargaining for a total product, and that is to have the remains of the victim either cremated or preserved? And to at least, if it was a cremation, to get the remains. Many of these people didn't even get the remains. They may have gotten the remains of somebody else. Isn't that correct? And isn't that part of this whole product? And it doesn't matter much that they got a gravestone to a person in that capacity, does it? Well, it's true that in some, in a few circumstances, that they may not have received the ashes. That's true in a couple of instances. How do you say a couple? Isn't it pretty clear that we can't tell what the numbers are as to them mixing remains? Your Honor, we certainly don't know absolutely for sure. I think there were assumptions that people did not receive their remains when the medical research companies purchased whole quantities of the remains, and they didn't receive any of the goods and services provided. That's why there is an initial loss. The Nexipkin victims certainly suffered some economic harm as a result of this. Well, also part of the whole product that some of the people bought was that they did not donate the remains, and yet in some number of them, the remains were taken anyway without authorization. So that's another piece of the product that some unknown number of these victims, they didn't get the product. Why should you be able to nitpick and say, well, you know, you got a gravestone. Don't complain about that. So let me deduct that. Your Honor, because that's what the guideline says to do. The guideline specifically says that the court shall provide credits against loss for the market value of goods and services that were in fact provided. And if I could just step back for a second and say that this wasn't the government's argument they're making on appeal, that none of these goods and services provided, that they necessarily had zero value. That wasn't the basis of the district court's ruling. That's an argument that is being presented for the first time on appeal, and it's only appropriate to affirm on alternative grounds if this court can rule that as a matter of law, and that's particularly inappropriate here where it would be a factually intensive inquiry as to what services, for example, like death certificates. I mean, there were some things that necessarily had a monetary value that were provided. My understanding that the proposition was that 29 percent, do I have the right number? Yes, Your Honor. How was that arrived at? So... It was 29 percent that she says that they got value. So at the sentencing hearing, the defense presented testimony from a paralegal who had gone through all the records provided in discovery and identified about 20 categories of goods and services, not including cremations or anything related to cremation, that were in fact provided to the next of kin victims. The government didn't dispute that any of those goods and services were in fact provided, or they didn't dispute that the amount that was charged was market rate. Okay, what were the items included in the 29 percent? You have headstones, what else? There were obituaries, death certificates, flowers, food, a clergy. There is a long list. So the paralegal took all of those, took an average figure and applied that to the total number of victims, and did the math. That's correct, Your Honor. And the government didn't dispute any of the math, any of the value of the services provided, that they were in fact provided. They didn't say that that was an unreasonable estimate of the legitimate goods and services that were provided. The only argument was that, and this is the argument that the district court adopted, was that the business was systematically tainted with fraud. And that's the only ruling that is on review for this court, and that's clearly erroneous. I shouldn't say clearly erroneous, it is, but it's also on de novo review for this court, because we're talking about the loss calculation methodology. There is no exception in the guidelines for refusing to provide credits against loss, where a business was systematically tainted with fraud. The cases that the government relies on, on appeal, and are the same ones that the district court relied on below, in each of those cases, all three of them, the district court in fact did provide credits against loss. So there's just no support whatsoever for this categorical rule prohibiting credits against loss when a business was systematically tainted with fraud. And it simply makes no sense. Just because a business is systematically tainted with fraud doesn't mean that, as a matter of inevitable fact, that victims can't receive any value from that business. Is it enough though to defeat the average argument, the 29.2 based on a limited sample being across the whole population? I agree it's not enough in a specific case, but is it enough to stop that 29% against an entire class, which isn't an estimate? I don't think so, Your Honor. And that would be a factual finding that the district court would have had to have made in the first instance. That's not for this court to review in the first instance. Again, this is not an argument that the district court addressed. There was no dispute that 29% was what was come about as a reasonable estimate. The ruling that is before this court, that the district court actually made, was this categorical rule prohibiting credits against loss. That is error as a matter of law. And to the extent that this court's not convinced that 29% is a reasonable estimate, then it could remand for further findings on that point. What was the dollar amount of the total of the 29%? Your Honor, I'm really not sure off the top of my head. It was 29% of the total of the I believe $700-something thousand dollars. But based on our calculation, reducing the Nexah-Kinns victims' loss amount by 29% to account for credits for goods and services actually provided, together with no loss to the medical research companies with which the government failed to prove that they suffered any economic loss. Let me ask you this. As I understand the calculations, assume we accept your arguments that there should have been credit of the 29%. And assume we agree with you that the harvesting of the organs did not result in any losses to the purchasers. You still end up with a credit in my calculation of $549,000, which is $1,000 under the amount in the guidelines. Isn't that close enough? I mean, isn't it time for rounding up by $1,000 when you're talking  about the $549,000? No, Your Honor. And the math that I came up with in the opening brief, which I think is supported, is slightly lower than that by maybe $20,000, $30,000. I think it was closer to about $522,000, I want to say. But the reality is that error affects the guideline range by two offense levels. Assume my figures are correct and not yours, and it's a mere $1,000. Is there a close enough rule? Is there a rounding up rule? Not rule, but common sense application in applying guidelines that are not mandatory. No, Your Honor. There's no it's okay to round up rule for the district court. If the district court had done that, said, by my math, everyone agrees that the number is $549,000, I'm just going to round up and say $550,000 to bump up into the next guideline range, that would be plainly incorrect. And it's worth mentioning the... Well, why? Yeah, why? I mean, I ask you a question and you say it's incorrect. But why is that wrong? Is this a common sense approach to recommended guidelines? Because the district court has to correctly calculate the guideline range. We're assuming that the calculation is correct. It's $549,000. Why isn't that enough? Because the guideline specifically says if the loss amount is less than $550,000, but greater than, I can't remember what the floor is at this point, but let's say greater than $400,000, if it's in the $400,000 to $550,000 range, then this is the guideline range number. Then it's a 12-level enhancement. A district court isn't free to just disregard that. Perhaps, under some circumstances, the they have to correctly calculate the guideline range. If you take Judge Philip's approach or his questions, the 29% is not a hard and fast figure. It's a reasonable estimate. It's based on averages. And we know, I mean, the defendant would get kind of a benefit on that one, kind of a mathematical assumption. Why can't you do the same on the other end? Just round up or assume it's close enough because the 29% is a little fuzzy. I think those would be factual findings that the district court would have to make. I think they could say that 29% is not a reasonable estimate for whatever reason. These goods and services were not, and it could manufacture some way to get up past the $550,000. But just to say, I'm going to round up for no particular reason, I think would be clearly a ronnie's factual finding. And it's also worth mentioning that the difference in the guideline range was it's a two offense level change, which took three years off of the guideline range. And a lot of that was lost. The loss did go from approximately $1.2 million down to $500,000, and let's say $49,000. It was the defendant's burden to prove the credits, right? Yes. And the whole loss guideline and commentary is talking about sometimes you just can't be that sure, and courts have to estimate, and they get some discretion. If the court were to have said, no, it's only 25%, and it came under $550,000, then you'd be fine with that. Your problem is that the court never said anything about 25% or 0%. It ruled on an entirely different basis. That's exactly right, Your Honor. And so that's why it's not harmless. Is that your position? That's exactly my position, Your Honor. I see that I'm out of time. If there are no further questions, I'd ask this Court to remand for re-sentence. May it please the Court. Elizabeth Ford Malani on behalf of the United States. The loss inquiry here is a two-step process. First, the court decides whether there is a loss to the victim that is a reasonably foreseeable pecuniary harm resulting from the offense. Second, the court decides whether the defendant has proven that she is entitled to reduce that loss amount to account for the value of the goods and services she provided to the victims. The court properly applied that two-step analysis here. Even if this court discerns a guidelines error, this is one of those rare cases where the record reveals that the court would have imposed the same sentence, putting aside that guidelines error, and that's why this court should affirm. You mean even without the two levels, the court still would have said 240 months? Yes, I think the record reveals that. Perhaps there would have been a substantive reasonableness challenge had the court done that, so there should be a re-roll on the dice on that if that's the approach, shouldn't there? I disagree, Your Honor, and I'd respectfully push back. I think for the same reasons that the record shows that the error here was harmless is the same reason that the sentence in this based on the 3553A factors and the statutory maximum, i.e. permissible basis to sentence the defendant, the record was fulsome as to why the court picked this particular sentence. The court varied up from, I think it was 188, I could be wrong, to 240, instead of from 151. That's a marked difference. And the court, to my knowledge, didn't say, and even if it did say that, we oftentimes send it back and say, we'll make sure about that. I think that the Geiswein case from this court makes clear that it's all about how the court got to its end point. And what's clear here is that it got to this end point based on those 3553A factors. Okay, maybe we just disagree on that, and I'll come around to your point, if you... But what about the chief point here, which is the district court had evidence presented it to it about credit. And the guidelines say, you shall credit. And instead of saying, well, wait a minute, what's your 27.2? I don't think that an urn should count in this instance, because it wasn't even the decedent's ashes or something, and being more precise about it and coming to 23% and saying, aha, you're still over 550, and so 14 levels. Instead of that, the court just uses that Mio case, is it, 8th Circuit, with rental deposits that weren't returned, and says, you're tainted by fraud, so I take a blind eye to that. Don't even talk to me about credits, because you're tainted with fraud. Why is that not reversible? So a few responses to that, Your Honor. First of all, I think it's clear, while my opposing counsel disagrees that the court made this conclusion, but I think the record reveals that the goods and services provided to the next of kin victims had no value to them. And remember, the guidelines, the offset rule, is termed in terms of value to the victim. It's not objective value. Did the district court say that, or is that you saying that? So I think that the court's order is clear that that's how it got there, because it set out that rule. Does it say that? So on page 73, Your Honor, the court cited Jarvis for the rule that no offset is proper when a defendant provides nothing of value. So it sets out this rule. Then a little bit later, it says that all of Hess's interactions with the next of kin victims were steeped in fraud, intertwined with fraud, and you can't separate them from the fraud. And that's on page 75 and 76. Well, what if they got a funeral service, and flowers were provided, and a death certificate, and maybe a minister said a few words? Can you per se say, sorry, no value on that. We hereby decree. So I think that the court properly did, and say, the value of those sorts of items to the victims were because of their associations with the decedents, right? And so an urn holding remains of someone who you don't know where they came from, I think that's perfectly proper for the court to say, that has no value. That's a fraction. You're not chipping at the 27.2, which I'm all for that. Certainly, Your Honor. And so a broader point in that regard, it was the defense burden to prove these offsets. So like opposing counsel recognized, there were, I mean, more than 15 different categories of reasons why they thought that they were entitled to this offset. If the defense were to parse through those and indicate that some of them did have value to the victims, that was the defense's burden to do. For instance, it was the defense's burden to say, the death certificates on average cost this much, there were 560 victims, therefore, this is the value. They didn't do that. And it's not even clear from the record that we could do that on appeal. Was there any attempt to cross-examine the paralegal on that? The paralegal's test on that point, no. There was more about whether or not the paralegal agreed with forgeries and things like that, but no, there wasn't. But it was the- But wouldn't that have been the appropriate thing for the government to do? And shouldn't they have done that in order for you to rely on the picking at it? I don't think so, Your Honor. Because again, this is the defense burden to put on, this is the value of what we gave to the victims, and here's why. And it was the government's position in volume one, page 404, the government said, the funerals the defendants provided for the decedents were so undermined by the defendants' gruesome conduct that they were essentially worthless to the next of kin. To the extent that- That goes to the laden with fraud theory, not counting the benefits, doesn't it? I mean, there are two different approaches to this. Oh, I think they're intertwined, Your Honor. I think that to the extent that the defendant argues that some of the goods and services provided to the next of kin victims were completely separate from the fraud, which is not what the court found, but that they did have some sort of objective value, it was the defense burden to prove that. And here, they lumped in headstones with death certificates and didn't separate out what was the value. Headstones with what? Death certificates, Your Honor. So I think that, you know, this court can resolve this entire appeal by upholding the district court's conclusion that because the goods and services were not valuable, had no value to the next of kin victims, that no offset was proper, and that same analysis applies to restitution. Can you follow that analysis, or you don't accept that? And that is that they had some value, but it was not established. Certainly. And that's a burden. And in that case, that would be a perfectly appropriate way to affirm as well, that the defendant didn't prove the offsets. Nor did the government choose to cross-examine on that. Right, but it's not the government's burden. It's only their burden to prove the losses. And the government put forth copious evidence about, you know, well, there was stipulations, too, about the amounts that was paid by this compilation of 560 decedents as families and next of kin. And there was testimony at the sentencing hearing from FBI special agents that talked about, you know, how we figured out the money aspect of this, which was complicated. And that's something that the defendant doesn't challenge on appeal. The initial $727,000 figure for those next of kin victims, the defendant doesn't challenge. And I think that to the extent that this court is concerned that there wasn't more of a parsing out, I just want to reiterate once again that that was the defense burden. The defense burden to tell the court, no, this is how much, on average, we paid to provide the death certificates to those next of kin victims. And that never occurred. And I do think that a fair reading of the record is that this is exactly what the court concluded, that there was no value provided to the victims. Again, setting out the no value rule from Jarvis, stating that everything that the defendants provided to the next of kin victims was intertwined, inseparable from the fraud. And then circling back to that Jarvis case and saying that applying offsets would legitimize the way Ms. Hess earned her money from the goods and services. So the court concluded that there's this rule that offsets are improper when there's no value to the victims. And then concluded that Hess didn't provide anything separate from fraud. I think the natural upshot of that is that nothing of value was provided because it wasn't separate from fraud. So I would be remiss if I didn't talk about the donor services buyers. So that's a different category of offsets. Or that's a different category of losses, rather. And in that case, the court properly found that those buyers had a reasonably foreseeable pecuniary harm of about $527,000. Under step one of the analysis, which is the only step that's pertinent here to this appeal, the court had to determine whether those buyers suffered pecuniary harm because of the offense. In other words, were those buyers out money because of the fraud? And was that reasonably foreseeable? The court correctly concluded, yes. Buyers paid money to Ms. Hess, that's the pecuniary harm, based on her fraudulent representations. Didn't the buyers get value? They were used in medical experiments, whatever. So I think that's two different questions, Your Honor. Well, it's one question. Did they get value? My apologies. I think that they did not get what they paid for. To the extent that they got some economic value, that was the defense burden. But did they get something different than if they had bought from someone else? Absolutely, Your Honor. I think that they did not get. They contracted for freely donated, legitimately donated remains that were free of infectious or potentially infectious disease. That is not what they received. And I think that Ms. Hess stipulated to this fact that she did not provide what she had promised and what those buyers had relied upon. So I think that this is not a case where the victims in that regard got exactly what they bargained for. But the victims would have spent the same money. Certainly, but that's a different question. I think that that is entirely. Remember that the loss measures the magnitude of the harm. It's not trying to make the victims whole. That's what restitution does. And that's a perfectly reason why that the restitution order in this case didn't request anything for those donor services buyers with the recognition that, well, first of all, there wasn't a response as to whether those donor services buyers requested any restitution. But this sort of fleshes out the difference between the harm and the loss and putting those victims back in the position they were in. And I think it's very clear here, per Hess's stipulation, that she just didn't provide what was in the contract, basically. And so Ms. Hess's real argument on appeal is the exact point that you brought up, Judge Phillips, that those buyers were able to get something out of what they received. But again, that is not a question of loss. That is a question of offsets or restitution. And in this case, the defendant didn't prove what value, if any, those donor services buyers received. It's difficult to discern how they would even make that point. I would be remiss if I didn't talk about the harmlessness argument. So we've sort of been talking about shaking out the monetary values here. If the court agrees with regard to one category of loss with the government's position and disagrees with the other, the amount would still exceed $550,000 for the reasons we set out in our brief. So I would encourage the court to consider that with regard to harmlessness. But even if the entire loss calculation was incorrect, I do think this is one of those rare cases where the record just shows over and over that the court made this particular sentencing determination based on the offense characteristics itself, Ms. Hess's personal characteristics, the harm, the egregious harm for these heinous crimes on the victims in this case, and as well as protecting the public. I think that that is clear. She emphasized these factors repeatedly and said, not only did the court say that the guidelines here isn't even enough to correctly satisfy the goals of sentencing. Immediately, the court pivoted and said, and that's why the statutory maximum sentence is what I'm going to impose here. You know, on the figures, it is determined that 29% is correct. Yes, Your Honor. And you add the confirmed losses and the estimated losses, that's $727,000. Not before excluding the 29%, right? You exclude the 29%. Doesn't that take it down to $549,000 or something? $516,000 is the math that I have, $516,000. But if you add, if the court was correct with regard to the donor services buyers, that's $527,000 on its own. Oh, you mean to the buyers of the organs? Right. All right. Just assume that away. If you credit the $29,000, 29%, and you deduct that from the $727,000, it's below $550,000, correct? Correct, Your Honor. But putting the other thing forward. And if that's the way we calculate, what do we do with that? Send it back? So I think that then you would have to decide whether the donor services losses were correctly calculated. Because if they were, that's. So this whole business is dependent on whether or not you accept completely the 29%. If you don't accept that, it's reduced by some amount. Yes, Your Honor. All right. So for the next of kin victims, that category would be reduced. That's what I'm talking about. I'm only talking about that. OK, got it. Got it.  OK, so that's correct. All dependent on that. Yes, Your Honor. All right. For these reasons, we'd ask to affirm. Did counsel have any time? All right, I'll give you a minute if you want to, and hold you to it unless there are questions. Thank you, Your Honor. First, the district court's findings are very clear that her theory is that it was a categorical one, that there are no credits against loss where the business is systematically tainted with fraud. It had nothing to do with the services, the 29% equaling exactly zero. And then as for the government's point that the value is based on the perspective of the victim, the case they rely on that is for an out-of-circuit, unpublished case, where what they mean by it's from the perspective of the victim, it's the amount that the victim who had received collateral, what they were able to get from it after the fraud was discovered. That's the value of the collateral, and it's from the perspective of the victim in that regard, as opposed to the value that the collateral was worth at the time of the fraud. And then just real quick as to restitution, if this court disagrees with the 29% and says that's not enough to get below the guideline range, it still would affect the restitution order. OK. Thank you, counsel, for your arguments. The case is submitted, and counsel are excused. We'll now take a 10-minute or so break before we pick up with the United States.